| | |
|---|---|
| JACQUELINE KENNEDY,<br>      Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>*Commissioner of Social Security*,<br>      Defendant. | No. 3:15-cv-1205 (VAB) |

**RULING ON MOTION TO REVERSE THE DECISION OF THE COMMISSIONER**

Jacqueline Kennedy ("Plaintiff") filed this administrative appeal under 42 U.S.C. § 405(g) against Carolyn Colvin, the Commissioner of Social Security ("Defendant" or "the Commissioner"), seeking to reverse the decision of the Social Security Administration ("SSA") denying her claim for Title II disability insurance benefits under the Social Security Act. Compl. at 1, ECF No. 1.

Ms. Kennedy moves for an order reversing the decision of the Commissioner or, in the alternative, an order remanding her case for rehearing. Mot. to Reverse, ECF No. 14. The Commissioner has moved for an order affirming the decision of the Commissioner. ECF No. 15.

For the reasons that follow, Ms. Kennedy's motion is **DENIED**, and the Commissioner's motion is **GRANTED**.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Facts

Born on October 16, 1959, Tr. at 26, Ms. Kennedy graduated from high school and received no other vocational training. Tr. 35. When she started treatment, she lived in Hartford, Connecticut. Tr. 410.

#### 1.   Medical Evidence

Ms. Kennedy's medical history includes diabetes mellitus, breast cancer, bi-polar disorder, major depressive disorder, post-traumatic stress disorder, anxiety disorder, arthritis, lumbar pain, and hypertension. Tr. 305, 307, 320, 334, 338, 349–50, 353, 355, 359, 361, 366, 383, 385, 401, 406–07, 413, 417–18, 420, 423–24, 427–34, 437, 442, 447, 458, 464, 476, 478, 492. Her diabetes is "poorly controlled," Tr. 305, 407, 458, and her hypertension is uncontrolled, Tr. 308–10, and she is, as a result, at risk of stroke or myocardial infarction, Tr. 310. She also has blurred vision while reading. Tr. 325.

During the spring and summer of 2010, Ms. Kennedy was diagnosed with stage III breast cancer. Tr. 342–44 (documenting discovery of 2.5 cm mass in her left breast and diagnosing suspected metastatic disease in lymph nodes), 392–95 (confirming presence of stage III carcinoma with metastases in lymph nodes), 398–99, 497–504 (confirming through MRI primary tumor in left breast and enlarged lymph nodes in left axilla). On June 4, 2010, she had surgery to remove a cancerous tumor and metastases in the axillary lymph nodes. Tr. 334–35. She was discharged the following day. Tr. 347–48. On June 17, 2010, a radiation oncologist examined her and recommended radiation therapy to prevent a local recurrence. Tr. 488–89. She underwent chemotherapy for five months and radiation for two months, and she has experienced hot flashes since that treatment. Tr. 320, 350.

On August 16, 2010, Ms. Kennedy visited Community Health Services. Tr. 475. She explained that she had stopped taking her blood pressure medication because it made her feel depressed, and that she would like to switch her medication. *Id.* Her blood pressure was elevated and uncontrolled; the advanced practice registered nurse (APRN), Rita Rivera, changed her medication, and noted that Ms. Kennedy was undergoing chemotherapy and experiencing side effects from the treatment. Tr. 476. She also noted that Ms. Kennedy had "benign essential hypertension," "poorly controlled" diabetes mellitus, and breast cancer. Tr. 476.

On August 21, 2010, Ms. Kennedy returned to Community Health Services for a diabetic foot screening with podiatrist Sherwin Tucker, DPM. Tr. 328, 474. He noted that she had newly been diagnosed with diabetes mellitus, and had been referred for a foot screen; he also marked that she did not report podiatric complaints, including that she was not experiencing tingling in her ankles, legs, or feet. Tr. 328. Dr. Tucker counseled Ms. Kennedy about diabetes mellitus and foot care. Tr. 329.

On August 26, 2010, Ms. Kennedy met with a registered dietician, Leila Bruno, MS, RD, CDE. Tr. 325. Ms. Bruno noted that Ms. Kennedy had been newly diagnosed with diabetes mellitus and that she also had breast cancer. *Id.* Ms. Kennedy reported that she had lost ten pounds over the past three months, was experiencing increased blurry vision, decreased appetite, and nausea, especially after the chemotherapy treatments. *Id.* Ms. Bruno's report also stated that Ms. Kennedy did not lack adequate sleep, and that she exercised regularly by walking, though less since she began receiving chemotherapy treatment. Tr. 326. Ms. Kennedy also reported that she was not feeling pain or numbness in her lower body, and Ms. Bruno noted that Ms. Kennedy's diabetes mellitus was under "fairly good control." Tr. 326. On September 2, 2010, Ms. Kennedy and Ms. Bruno attended a diabetes education class. Tr. 324–25.

On December 22, 2010, Ms. Kennedy visited Community Health Services to request a refill of her blood pressure medication and met with registered nurse Everol Ennis. Tr. 322–23; 467–69. She had stopped taking her diabetes mellitus medication because "she read about [a] side effect of nausea and stated that chemo was already making her nauseous." Tr. 322. Her final round of chemotherapy was scheduled for that week. *Id.* She also stated that she stopped taking her blood pressure medication because it made her depressed, but that she was ready to begin taking the medication again. *Id.* Nurse Ennis assessed that Ms. Kennedy had "[b]enign essential hypertension poorly controlled" because Ms. Kennedy had not been taking medication for months. Tr. 323. She also assessed that Ms. Kennedy's diabetes mellitus was "poorly controlled secondary to no medication for months." *Id.*

On January 24, 2011, Ms. Kennedy visited Community Health Services for a follow-up appointment and met with Dr. Daman Ali. Tr. 320–21; 465–66. At that point, Ms. Kennedy had completed chemotherapy and was scheduled for radiation therapy to begin after a few weeks. Tr. 320. Dr. Ali noted that Ms. Kennedy's blood pressure was elevated, and that she reported that she had been experiencing hot flashes since finishing chemotherapy. Tr. 321.

Ms. Kennedy underwent radiation therapy until late April 2011. Tr. 494–95. She reported having a localized skin reaction and feeling fatigued after completing the radiation, but she otherwise tolerated the treatment and recovered well. Tr. 492. She had a mammogram on May 11, 2011, that revealed no evidence of malignancy. Tr. 341, 491.

On May 18, 2011, Ms. Kennedy returned to Community Health Services and met with Dr. Darren Martin, who checked her blood pressure and blood sugar. Tr. 461. Dr. Martin noted that Ms. Kennedy's blood sugar was within normal limits, and her blood pressure was slightly elevated. *Id.* Dr. Martin also noted that Ms. Kennedy reported that she was complying with

medications, but also reported that she does not like to take medications; Dr. Martin advised her of the importance of complying with her prescription. *Id.*

On June 3, 2011, Ms. Kennedy returned to Ms. Bruno for nutrition counseling. Tr. 318–19; 459–60. Ms. Bruno noted that Ms. Kennedy had elevated blood pressure and was overweight, and that Ms. Kennedy reported that she was walking, doing exercise, had new glasses, and that her energy was improving. Tr. 318–19. Ms. Bruno also noted that she suspected that Ms. Kennedy's diabetes mellitus had not improved, and that she had hyperlipidemia. Tr. 319. Ms. Bruno counseled Ms. Kennedy about her "medication administration and compliance" and about her diet. Tr. 319.

On June 7, 2011, Ms. Kennedy visited Community Health Services for a physical. Tr. 455. She reported anxiety and depression, as well as feeling tired. Tr. 456. She also visited Community Health Services on June 21, 2011, and reported that she had been feeling "weird" on her medication, and that she had been experiencing headaches for about two weeks. Tr. 305.

On July 5, 2011, Ms. Kennedy returned to Community Health Services for a blood pressure check, and met with APRN Susan Neagle. Tr. 316. Nurse Neagle recorded that Ms. Kennedy's blood pressure was elevated. Tr. 316–17. Nurse Neagle renewed Ms. Kennedy's prescription, making some changes to the medication, and told Ms. Kennedy to follow up in two weeks. Tr. 315. Ms. Kennedy missed the next appointment; she returned on September 8, 2011, for refills of her prescription. *Id.* She also returned on October 25, 2011. Tr. 311–13. Nurse Neagle noted on that visit that Ms. Kennedy had elevated blood pressure, and that her diabetes was better under control. Tr. 313.

On November 8, 2011, Ms. Kennedy visited Community Health Services for a blood pressure check. Nurse Neagle noticed an improvement since Ms. Kennedy's last visit, and also

noted that Ms. Kennedy "stated that she is not compliant with her medications because she has a problem with focusing because she is out of a job," and that Ms. Kennedy "states that she takes the medication probably three times out of the week." Tr. 310. Nurse Neagle advised Ms. Kennedy of the "importance of taking all medications as prescribed." Tr. 310. On December 1, 2011, Ms. Kennedy returned, and Nurse Neagle noted that her blood pressure was "uncontrolled." Tr. 309–10.

On February 23, 2012, Ms. Kennedy had a bilateral mammogram that revealed no malignancy. Tr. 340.

On July 3, 2012, Ms. Kennedy returned to Community Health Services for a refill of her prescription. Tr. 307–08; 441–42. She also requested, and was prescribed, Effexor for depression. Tr. 307–08. She returned on June 21, 2012, for a blood pressure check; she reported that she had not been taking her medication because she "felt 'weird on it.'" Tr. 305.

On September 14, 2012, through the referral of her primary care physician, Ms. Kennedy met with a licensed clinical social worker, Maritza Degonzalez, because Ms. Kennedy had stopped eating and was sleeping ten or eleven hours each day. Tr. 378. Ms. Kennedy reported to Ms. Degonzalez that she had plans to commit suicide by overdosing on medication, and she described a previous suicide attempt, several years earlier: she had set her car on fire while inside it, and then was hospitalized at Mt. Sinai Hospital. Tr. 378.

Ms. Kennedy also reported a history of alcohol abuse, a previous boyfriend who had physically and verbally abused her, and that she had recently lost her job and faced eviction. Tr. 379. Ms. Degonzalez recorded that Ms. Kennedy appeared depressed, that her thought process appeared impaired, and that her thought content appeared relatively impaired. Tr. 380. Ms. Degonzalez also referred Ms. Kennedy to go to the emergency room "for further evaluation and

possible in patient hospitalization for safety and medication evaluation." Tr. 382. Ms. Kennedy was taken to the hospital in an ambulance. Tr. 382. Once there, hospital staff diagnosed Ms. Kennedy as having had an anxiety attack and being depressed. Tr. 350.

On September 29, 2012, Ms. Kennedy met with licensed clinical social worker Joanne Gayeski and psychologist Margarita Hernandez. Tr. 349–53. Ms. Kennedy reported her medical history, described above, as well as her typical behavior: she described that she was "independent but is not self-motivated," that she "can do her own grooming, cleaning, shopping, and cooking," and that she "is able to take public transportation without assistance." Tr. 351. The report also stated that Ms. Kennedy "is knowledgeable of how to pay bills, use the telephone directory, and utilize postal and banking services." *Id.* Ms. Kennedy stated that she was "currently working part time as a personal care assistant, indicating that her start date was July 2012." *Id.* She reported that she worked fifteen hours bi-weekly. *Id.* She also reported that before that job, she worked as a supervisor "for female adolescents in a supervised living apartment program," and that she quit that job "due to a client directing threatening behavior toward her." *Id.* She also stated that she had previously worked as an American Airlines reservation agent and as a bartender. *Id.*

Ms. Gayeski and Dr. Hernandez diagnosed Ms. Kennedy with mixed anxiety-depressive disorder and alcohol dependence, with moderate symptoms. Tr. 353. They also noted that she was employed part-time, that she had a history of trauma, was the victim of neglect, had suffered emotional and physical abuse, was the witness and victim of domestic violence and a victim of sexual abuse and two sexual assaults, and that she had a family history of psychiatric and mental health issues including substance abuse. Tr. 353. They stated in their clinical impressions that "Ms. Kennedy is reporting clinically significant symptoms of anxiety and depression," but found

that "the criteria are not met for either a specific Mood Disorder or a specific Anxiety Disorder." Tr. 352. They also stated that Ms. Kennedy "is able to relate well with others," but she "has struggled with tolerating stressors, presenting with a significant substance abuse history." Tr. 353. Moreover, they reported that "Ms. Kennedy has demonstrated a maladaptive pattern of alcohol use leading to clinically significant impairment." Tr. 353. They concluded that "[h]er prescription medication appears to support some of her medical issues, but there was lack of documentation of her medication and treatment," and she "alleges not to have any physical limitations and is able to complete all daily activities independently." Tr. 353.

Ms. Kennedy attended nine group therapy sessions at Community Health Services during the fall of 2012, and then began to attend individual therapy sessions with licensed professional counselor Amy Mourabit. Tr. 369–71. Ms. Mourabit recorded that Ms. Kennedy had "severe recurrent major depression." Tr. 370. Ms. Mourabit also noted that Ms. Kennedy "reported having a recent exacerbation of depression symptoms, isolating at home, lack of social support, financial issues due to leaving job . . ., end of relationship with boyfriend two months ago, and is in the process of being evicted from her apartment." Tr. 371. Ms. Mourabit recommended that Ms. Kennedy continue to attend weekly group therapy sessions and individual therapy sessions. Tr. 371. Ms. Kennedy met with Ms. Mourabit again on November 2, 2012, and reported feeling depressed and anxious, particularly about potential eviction. Tr. 367–68.

On November 5, 2012, Ms. Kennedy met with Dr. Eugenia Popescu. Tr. 365. Dr. Popescu reported that Ms. Kennedy presented problems of depression and insomnia, among other things, and prescribed medication for each. Tr. 367.

On November 9, 2012, Ms. Kennedy met again with Ms. Mourabit. Tr. 363–64. Ms. Mourabit assessed Ms. Kennedy as having alcohol abuse, cannabis abuse, severe recurrent major

depression, and acute post-traumatic stress disorder. Tr. 363. Ms. Kennedy reported that the new medication that Dr. Popescu had prescribed had decreased Ms. Kennedy's desire to drink. Tr. 364. She also "reported having a new diagnosis possibly Bipolar Disorder . . . and stated that her father was diagnosed with that years ago." Tr. 364.

On November 19, 2012, Ms. Kennedy returned to Dr. Popescu to adjust her medication because she continued to feel depressed. Tr. 360–61. Dr. Popescu gave Ms. Kennedy a new prescription and recommended that she continue therapy. Tr. 361.

On November 20, 2012, Ms. Kennedy met with Ms. Mourabit. Tr. 359–60. Ms. Kennedy reported that she "had an emotional meltdown" recently during a church service, and that she "[had] to go to trial for eviction from her apartment" and did not have a lawyer. Tr. 360. She also reported that she no longer received disability benefits, which she had been receiving while she was being treated for breast cancer, and that she had difficulty paying her rent. Tr. 360. Ms. Kennedy also stated that she planned to visit CT Works for guidance to find a new job, and that she had last had a drink two weeks earlier. Tr. 360. Ms. Mourabit also noted that Ms. Kennedy "is not at a place where she can accept [she] might have addiction issues[.]" Tr. 360.

On November 26, 2012, the physician who had been treating Ms. Kennedy's breast cancer reported that Ms. Kennedy had completed treatment in December 2010, and there had been no evidence since then of recurrence, or of significant residual effects of chemotherapy and radiation treatment. Tr. 354.

On December 10, 2012, Ms. Kennedy met with Ms. Mourabit and explained that she would soon be evicted and planned to move to New Britain, Connecticut, where her son was a landlord. Tr. 356–57. Ms. Kennedy also reported "feeling [that the] new psychiatric medications

are helping her to not feel so high, low, and [that she] has been decreasing irritability, anger, mood swings." Tr. 357.

On December 18, 2012, Ms. Kennedy met with Dr. Popescu to manage her medication. Tr. 355–56. Dr. Popescu noted that Ms. Kennedy had "mild depression, decreased labile mood," did not report side effects, and "[l]oves the new place in New Britain." Tr. 356.

Due to "issues with Medicare, Medicaid insurance," Ms. Kennedy stopped coming to her therapy sessions after December 18, 2012. Tr. 410. Community Health Services reportedly attempted to contact Ms. Kennedy several times, but eventually administratively discharged her file on February 28, 2013, because she was not attending therapy sessions. Tr. 410.

On May 16, 2013, Ms. Kennedy returned to Community Health Services for treatment for back pain. Tr. 406. Her report showed no abnormalities, but her blood pressure was "elevated due to noncompliance" with her medication. Tr. 407.

**B.  Procedural History**

Ms. Kennedy filed an application for a period of disability and disability insurance benefits on July 2, 2012, alleging disability beginning March 27, 2012. Tr. at 18. Her claim was initially denied on December 13, 2012, and denied again on reconsideration on March 1, 2013. *Id.* On May 31, 2013, Ms. Kennedy filed a written request for a hearing under 20 C.F.R. § 404.929. *Id.* On March 27, 2014, the SSA held a hearing in Hartford; Ms. Kennedy appeared, represented by counsel, as did Hank Lerner, an impartial vocational expert. *Id.*

Ms. Kennedy stated that she was working as a personal care assistant for one individual. Tr. 35–36. The job, she explained, involved cleaning and heating food, for about four hours each week. Tr. 36. She also stated that she had worked a similar job for a different woman previously, for about a year, from 2012 until 2013. Tr. 36. Before that, Ms. Kennedy did administrative work

for about a year between 2008 and 2009, and before that, worked in the reservation sales department of American Airlines. Tr. 38.

She testified that she received disability insurance benefits after she was diagnosed with breast cancer for a closed period of time, and that, since the chemotherapy and radiation, she has suffered from anxiety and memory loss. Tr. 39–40. She described having anxiety attacks, racing thoughts, trouble sleeping, and low energy. Tr. 42. She stated that she would not be able to perform a full-time job. Tr. 44.

Hank Lerner also testified as a vocational expert. Tr. 49–55. He testified that he had reviewed Ms. Kennedy's vocational record before the hearing. Tr. 49. He testified that the work that Ms. Kennedy was doing was either light or medium exertional work and that it was low level semiskilled. Tr. 49–50. He testified that Ms. Kennedy "could not perform past relevant work, the rationale being that that past relevant work is not simple, routine, one or two step, simple type tasks." Tr. 52. He also stated that "[t]here would be unskilled positions that are simple routine tasks with minimum decision making, changes, minimum use of [judgment], and no strict time productions and quotas," such as a cafeteria attendant, an injection molding machine tender, or a hand packager of plastic parts. Tr. 52–53. He also testified that there would be 236,000 jobs as a cafeteria attendant, 6,000 jobs as an injection molding machine tender, and 4,400 jobs as an inspector and hand packager of plastic parts available nationally. Tr. 52–53.

After the hearing, on April 15, 2014, the Administrative Law Judge ("ALJ") found that Ms. Kennedy was not entitled to disability insurance benefits, based on the following findings:

> 1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.
>
> 2. The claimant has not engaged in substantial gainful activity since March 27, 2012, the alleged onset date (20 C.F.R. 404.1571 *et seq.*).

3. The claimant has the following severe impairments: anxiety disorder and mixed anxiety-depressive disorder (20 C.F.R. 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations: The claimant is able to understand and remember simple one or two-step instructions. The claimant can carry out simple tasks in an environment with minimal changes, minimal decision-making, and minimal use of judgment, without the need to adhere to strict time or production quotas.

6. The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565).

7. The claimant was born on October 16, 1959 and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 C.F.R. 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills (see SSR 82-41 and 20 C.F.R. Part 404, Part P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as define din the Social Security Act, from March 27, 2012, through the date of this decision [April 15, 2014] (20 C.F.R. 404.1520(g)).

Tr. 20–27.

On June 13, 2014, Ms. Kennedy requested a review of the ALJ Decision, Tr. 12–14, and on June 12, 2015, the Appeals Council reviewed Ms. Kennedy's case and found that she was not entitled to disability insurance benefits, Tr. 15–17.

On August 10, 2015, Ms. Kennedy filed a Complaint in this Court seeking to appeal the Appeals Council's decision. ECF No. 1. On February 22, 2016, she moved for an order reversing the decision. ECF No. 14-1 at 2. She also filed an alternative motion for remand, seeking a new hearing and a new decision "to rectify the errors committed by the ALJ." *Id.* at 4.

## II.  STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court reviewing a disability determination "must determine whether the Commissioner's conclusions 'are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.'" *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)); *see also Moreau v. Berryhill*, 2018 WL 1316197, at *3 (D. Conn. 2018) ("Under section 405(g) of title 42 of the United States Code, it not a function of the district court to review de novo the ALJ's decision as to whether the claimant was disabled . . . . Instead, the court may only set aside the ALJ's determination as to social security disability if the decision 'is based upon legal error or is not supported by substantial evidence.'") (internal citation omitted) (quoting *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)).

The ALJ's decision is supported by substantial evidence if there "is 'more than a mere scintilla'" of evidence to support the conclusion. *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). Substantial evidence "means such *relevant* evidence as a *reasonable* mind might accept as adequate to support a conclusion." *Id.* at 447–48 (quoting *Moran*, 569 F.3d at 112). This standard of review

is "very deferential." *Id.* at 448 ("But it is still a very deferential standard of review—even more so than the 'clearly erroneous' standard.") (citing *Dickson v. Zurko*, 527 U.S. 150, 153 (1999)).

## III.    DISCUSSION

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled under the Social Security Act, an ALJ must perform a five-step evaluation. *See* 20 C.F.R. § 416.920(a)(4)(i)–(v). First, the ALJ must consider whether the claimant is performing gainful work activity. *Id.* § 416.920(a)(4)(i). If the claimant is doing substantial gainful activity, the claimant is not disabled. *Id.* Second, the ALJ must consider the medical severity of the impairment that limits his or her ability to do basic work activities. *Id.* § 416.920(a)(4)(ii). If the claimant does have a severe medical impairment, then the ALJ considers whether, based on the medical evidence, the claimant has an impairment that "meets or equals" an impairment listed in Appendix 1 of the regulations. *Id.* § 416.920(a)(4)(iii). If the claimant does have an impairment that meets or equals the impairments in that list, and the impairment meets the duration requirement, i.e., lasts at least twelve months or results in death, *see* 20 C.F.R. § 416.909, then the ALJ will find the claimant disabled without considering non-medical evidence, such as vocational experience, education, and work experience. 20 C.F.R. § 416.920(a)(4)(iii).

Fourth, the ALJ considers the claimant's "residual functional capacity and [ ] past relevant work." 20 C.F.R. § 416.920(a)(4)(iv). If the claimant is able to perform past relevant work, the claimant is not disabled. *Id.* Finally, fifth, the ALJ considers the claimant's "residual

functional capacity and [ ] age, education, and work experience" to evaluate whether the claimant "can make an adjustment to other work." *Id.* § 416.920(a)(4)(v). If the claimant is able to adjust to other work, then the ALJ will find the person not disabled; if the claimant cannot make the adjustment, the ALJ will find the person disabled. *Id.*

Here, the ALJ found that Ms. Kennedy had not engaged in substantial gainful activity since her alleged onset date, March 27, 2012, and found that her anxiety disorder and mixed anxiety-depressive disorder were severe impairments. Tr. 20. The ALJ next found, however, that "[t]he severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria [for a disability]." Tr. 21. The ALJ explained that for a mental impairment to be severe enough to constitute a disability, it must:

> result in at least two of the following: marked restriction of activities in daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

Tr. 22.

Applying that standard to this case, the ALJ found that Ms. Kennedy has "mild restriction" in her activities of daily living; she is able to perform the "mental demands of routine activities of daily living," to live independently, "work as a personal care attendant assisting others with activities of daily living, and uses public transportation without assistance." *Id.* The ALJ thus found her limitation mild. *Id.* The ALJ also found that she had mild difficulties in social functioning, including her capacity "to interact appropriately and communicate effectively with others." *Id.* The ALJ explained that Ms. Kennedy is able to "communicate well," carry on a conversation, and relate to others. *Id.* In addition, the ALJ found that Ms. Kennedy had moderate

difficulties in her concentration, persistence, and pace. *Id.* Finally, the ALJ found that Ms. Kennedy had not experienced episodes of decompensation. *Id.*

In sum, the ALJ concluded, "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration," Ms. Kennedy's limitations did not support a finding of a disability. *Id.*

### A.    Severe Impairment

Ms. Kennedy argues that the ALJ erred in the second step of the analysis by finding that her "only severe impairments are anxiety disorder and mixed anxiety-depressive disorder." Pet. Br. at 7 (citing Tr. 20–21). She contends that the ALJ should have also found that her diabetes mellitus, breast cancer, and hypertension were severe impairments. *Id.* She argues that her breast cancer, although now in remission, is "not a 'slight abnormality'" because "[e]ven breast cancer that is in remission or even cured has lasting effects on the patient's ability to function well after treatment has ended," and in her case, she suggests that chemotherapy and radiation contributed to her fatigue. *Id.* at 7–8 ("Since these effects of Chemotherapy and Radiation and executive functioning are well documented results of these life-saving but toxic treatments, and since Ms. Kennedy has reported these problems in her daily functioning, the ALJ should have found Ms. Kennedy's breast cancer and side-effects of treatment to be severe impairments.") (citations omitted).

The Commissioner, on other hand, argues first that any error that the ALJ made in not finding that Ms. Kennedy's diabetes, breast cancer, and hypertension were not severe is harmless. Def.'s Br. at 15. Still, the Commissioner argues, "the ALJ reasonably concluded that Plaintiff's diabetes and hypertension were not severe impairments." *Id.* Furthermore, the

Commissioner argues that, as for Ms. Kennedy's breast cancer, "it is not sufficient that she establish the mere presence of a disease or impairment. She must show that the disease or impairment has caused functional limitations that preclude her from engaging in any substantial gainful activity." *Id.* at 16 (citing *Rivera v. Harris*, 623 F.2d 212, 215–16 (2d Cir. 1980)).

The Court agrees with the Commissioner that the ALJ did not err in finding that Ms. Kennedy's breast cancer, hypertension, and diabetes were not severe impairments. First, the ALJ considered whether any of those conditions would have created limitations or impairments for Ms. Kennedy, and concluded that they would not:

> The longitudinal record reflects that the claimant has occasional complaints of back pain or leg tingling, and her blood pressure is sometimes characterized as uncontrolled. Overall, however, the lack of exertional limitations is supported by the record, which shows that her breast cancer is in remission and that her medically determinable diagnoses of high blood pressure and diabetes mellitus do not consistently cause more than minimal work-related limitations over a twelve-month period.

Tr. 21. The Court agrees.

The ALJ's decision was based on substantial evidence, including that Ms. Kennedy's doctor stated that her breast cancer had been in remission since 2010, with no signs of recurrence, Tr. 354, and that reports from Ms. Kennedy's doctors' appointments did not indicate that her hypertension or diabetes had caused her to have limitations in her abilities. *See, e.g.*, Tr. 318–19 (describing walking, doing exercise, and improved energy levels); *see also Brault*, 683 F.3d at 447–48 (explaining that substantial evidence necessary to support conclusion "means such *relevant* evidence as a *reasonable* mind might accept as adequate to support a conclusion" and that district court's review of ALJ's determination is "very deferential"). Rather, the record indicates that, as the ALJ found, Ms. Kennedy's anxiety and depression imposed limitations on her ability to navigate daily life—not her hypertension, diabetes, or breast cancer. *See, e.g.*, Tr.

359–60 (describing "emotional meltdown"); Tr. 363 (assessing Ms. Kennedy with severe recurrent major depression, and acute post-traumatic stress disorder).

In any event, the ALJ proceeded to the next step of the evaluation process—even if not for the reasons that Ms. Kennedy now argues it should have proceeded—and as a result, any error in the ALJ's determination of the status of Ms. Kennedy's breast cancer, hypertension, and diabetes is harmless. *See Stanton v. Astrue*, 370 Fed. App'x 231, 233 n.1 (2d Cir. 2010) (finding harmless error where "the ALJ did identify severe impairments at step two, so that Stanton's claim proceeded through the sequential evaluation process. Further, contrary to Stanton's argument, the ALJ's decision makes clear that he considered the 'combination of impairments' and the combined effect of 'all symptoms' in making his determination.") (citing 42 U.S.C. § 423(d)(2)(B) (requiring consideration of "combined effect of all of the individual's impairments"); *accord* 20 C.F.R. § 404.1523).

### B.     Factual Errors

Ms. Kennedy also argues that the ALJ committed a "serious factual error of the evidence" by mischaracterizing her medical records. Pet. Br. at 9. In particular, Ms. Kennedy argues that the ALJ erroneously stated that Ms. Kennedy is able to perform housework, prepare meals, and go out with friends. *Id.* (quoting Tr. 24). Ms. Kennedy argues that "the ALJ made [it] seem as if Ms. Kennedy is able to perform a wider variety of tasks than her testimony actually reflected," and then "used this misstatement to find Ms. Kennedy not entirely credible." *Id.* at 10. The Court disagrees.

The ALJ did note that Ms. Kennedy is able to "work part-time, perform housework, shop, and prepare meals," and that the "record also reflects that she socializes, going out to clubs with friends." Tr. 24. The ALJ's explanation of his denial, however, continues: he cites the medical

record to support his conclusion that Ms. Kennedy "had some difficulties with attention and concentration but concluded that she is capable of sustaining attention sufficiently to perform simple tasks," and that her mental status examinations reflected "generally normal findings" that did not "support the claimant's testimony regarding disabling memory problems." Tr. 24. The ALJ also noted that Ms. Kennedy's "most recent treatment notes characterize the claimant's depression as 'mild' and note a decrease in mood lability, which does not support disabling limitations," and found "no indication of a disabling level of panic episodes." Tr. 24. The ALJ therefore concluded that Ms. Kennedy "is capable of unskilled type work," and that she is "able to work within the restrictions assigned." Tr. 25.

The Court does not find a serious factual error in this characterization of the medical records. Rather, the ALJ took into consideration that Ms. Kennedy recently had an anxiety attack, Tr. 24 ("[T]he claimant described a panic episode to the consultative examiner and reported an 'emotional meltdown' at church in October 2012."), and noted her difficulty in concentrating, *id.* ("the claimant reported suicidal ideation and a prior attempt and was transported to St. Francis Hospital for evaluation," which found that "the claimant had some difficulties with attention and concentration but concluded that she is capable of sustaining attention sufficiently to perform simple tasks"), but ultimately found that the medical reports in the record did "not support the claimant's testimony regarding disabling memory problems," *id.* The Court agrees, and finds that the ALJ's conclusions were supported by substantial evidence in the record, including the reports of Ms. Kennedy's treating physicians. *See Schaal*, 134 F.3d at 501 ("[W]e must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.") (quotation marks and citation omitted).

## C.     Available Jobs

Ms. Kennedy also argues that, at the fifth step of the disability evaluation, "the burden of proof is on Defendant to show the actual number of jobs that exist in the State of Connecticut, that someone with Ms. Kennedy's actual Residual Functional Capacity can perform," and argues that in this case, the ALJ failed to do so. Pet. Br. at 11. Defendant, on the other hand, argues that the ALJ "properly relied on the vocational testimony at step five to conclude that jobs exist in significant numbers in the national economy that Plaintiff could perform, and thereby concluded that Plaintiff was not disabled under the Act." Def.'s Br. at 21 (citing Tr. 27).

Ms. Kennedy is correct that, at step five, the Commissioner has the burden of proving that Ms. Kennedy is capable of working. *Bavaro v. Astrue*, 413 Fed. App'x 382, 384 (2d Cir. 2011) ("The Commissioner has the burden in step five of the disability determination to prove that the claimant is capable of working."). The Court disagrees, however, that the Commissioner must prove that there are jobs "that exist in the State of Connecticut" that someone with Ms. Kennedy's capacities could perform. *See* Pet. Br. at 11. Instead, "work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions in the country." 20 C.F.R. § 404.1566(a). "It does not matter whether . . . [w]ork exists in the immediate area in which you live." *Id.* The ALJ therefore properly relied on the evaluation of the vocational expert, who listed three jobs that he had determined that Ms. Kennedy would be capable of performing: cafeteria attendant, injection molding machine tender, and hand packager of plastic parts. *See* Tr. 52–53.

The Court finds that the ALJ properly relied on the vocational expert's testimony regarding hypothetical available jobs at Ms. Kennedy's capability levels. *See Calabrese v. Astrue*, 358 Fed. App'x 274, 276 (2d Cir. 2009) ("An ALJ may rely on a vocational expert's

testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence . . . and accurately reflect the limitations and capabilities of the claimant involved.") (citations omitted). Ms. Kennedy's motion to vacate the ALJ's decision or to remand for a new hearing therefore is denied. The Commissioner's motion for an order affirming the decision is granted.

## IV.    CONCLUSION

For all of the foregoing reasons, Ms. Kennedy's motion to vacate the ALJ's decision or to remand for a new hearing therefore is **DENIED**. The Commissioner's motion for an order affirming the decision is **GRANTED**.

SO ORDERED at Bridgeport, Connecticut, this 27th day of March, 2018.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE